# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID LITTLEFIELD, MICHELLE LITTLEFIELD, TRACY ACORD, DEBORAH CANARY, FRANCIS CANARY, JR., VERONICA CASEY, PATRICIA COLBERT, VIVIAN COURCY, WILL COURCY, DONNA DeFARIA, ANTONIO DeFARIA, KIM DORSEY, KELLY DORSEY, FRANCIS LAGACE, JILL LAGACE, DAVID LEWRY, KATHLEEN LEWRY, MICHELE LEWRY, RICHARD LEWRY, ROBERT LINCOLN, CHRISTINA ALMEIDA, CAROL MURPHY, DOROTHY PEIRCE, and DAVID PURDY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA A. HAALAND, in her official capacity as Secretary of the Interior; BUREAU OF INDIAN AFFAIRS, U.S. Department of the Interior; and BRYAN NEWLAND, in his official capacity as Assistant Secretary – Indian Affairs, U.S. Department of the Interior, <br><br> Defendants. | Civil Action No. 1:22-cv-10273 |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs David Littlefield, Michelle Littlefield, Tracy Acord, Deborah Canary, Francis Canary, Jr., Veronica Casey, Patricia Colbert, Vivian Courcy, Will Courcy, Donna DeFaria, Antonio DeFaria, Kim Dorsey, Kelly Dorsey, Francis Lagace, Jill Lagace, David Lewry, Kathleen Lewry, Michelle Lewry, Richard Lewry, Robert Lincoln, Christina Almeida, Carol Murphy, Dorothy Peirce, and David Purdy (collectively, "Plaintiffs") bring this complaint for declaratory and injunctive relief against Defendants the United States Department of Interior ("Interior"), Deb Haaland, in her official capacity as United States Secretary of the Interior ("Secretary"), the Bureau of Indian Affairs ("BIA"), and Bryan Newland, in his official capacity as Assistant Secretary of the Interior for Indian Affairs.  In support thereof, Plaintiffs state as follows:

## INTRODUCTION

1.     The action is brought to overturn the unlawful decision of the Secretary of the Interior (the "Secretary") to take into trust, for the benefit of the Mashpee Wampanoag Tribe ("Mashpees" or "Tribe"), 151 acres of land located in the City of Taunton, Bristol County, Commonwealth of Massachusetts, and 170 acres of land located in the Town of Mashpee, Barnstable County, Commonwealth of Massachusetts ("Designated Lands"), and declare those lands eligible for gaming under the Indian Gaming Regulatory Act ("IGRA").  The Secretary based her decision on a conclusion that the Tribe was "under Federal jurisdiction" in 1934.  The Secretary also decided that the Tribe had a sufficient connection to the Taunton portions of the Designated Lands, and that the Designated Lands could somehow constitute a single "reservation," despite not being adjoined together.  For the reasons set forth below, the Secretary's determinations were arbitrary, capricious, and otherwise not in accordance with law.  The Secretary's decision is set forth in a Record of Decision dated December 22, 2021 ("2021 ROD," attached hereto as Exhibit

1

A), which "confirms" an earlier Record of Decision dated September 18, 2015 ("2015 ROD," attached hereto as Exhibit B).[1]

2.      The 2021 ROD incorporates by reference the entirety of the 2015 ROD (which is attached as an appendix to the 2021 ROD), save Sections 8.3 and 7.0, which are replaced by text in the December 22, 2021 ROD, as stated therein:

> Upon issuance, this letter confirms the 2015 decision to acquire the Parcels in trust as the Tribe's reservation. This decision incorporates the 2015 ROD except for the analyses contained in Sections 8.3 and Section 7.0 which are replaced by the analyses contained herein. This letter along with the incorporated portions of the attached Appendix, replace the 2015 ROD as the final agency action with respect to the Tribe's application.

2021 ROD at 2.

3.      The 2021 ROD removes the Designated Lands forever from the tax and regulatory jurisdiction of the Commonwealth of Massachusetts, the Counties of Bristol (Taunton parcel) and Barnstable (Town of Mashpee parcel), the City of Taunton, and the Town of Mashpee.

4.      According to the Tribe, it intends to operate a tax- and regulation-free reservation on the Taunton portions of the Designated Lands.  Specifically, the Mashpees intend to build and operate a Las Vegas-style casino resort called "First Light," complete with a 15-to-17-story-high main building, three hotels, and parking for 6,000 vehicles.  The main tower building, if constructed, will be the tallest structure for miles around, purportedly able to catch the sun's first rays and light up the night sky—a highly visible intrusion, day and night, 24 hours a day, 365 days a year.

---

[1] Plaintiffs are residents of Taunton who are directly impacted by any development of the 151 acre parcel in Taunton as alleged herein at Paragraphs 8-24.  The 2021 ROD also took into trust 170 acres in the Town of Mashpee, Barnstable County, about 50 miles away. The principal ground on which Plaintiffs seek to overturn the 2021 ROD—i.e., that the Secretary lacks statutory authority to take into trust any lands for the Mashpees—affects the parcels in the Town of Mashpee as well as in Taunton.

5.      Unless this Court intervenes and recognizes that the Secretary's decision to take land into trust is arbitrary, capricious, and not otherwise in accordance with law, the "First Light" destination resort casino will dominate the residential East Taunton neighborhood in which it will be located.  The proposed development, valued at more than a billion dollars, is a testament to the ambitions of the Mashpees and their Malaysian business partners (Genting Group), all responding to the economic incentives created by IGRA.

6.      This community-altering casino development can legally happen only if the Secretary of the Interior possesses authority under the Indian Reorganization Act, 25 U.S.C. § 5129, to take the Designated Lands into trust.

7.      The Secretary lacks the statutory authority to take lands into trust for the Mashpees. The Mashpees were not a federally recognized tribe under federal jurisdiction in 1934 and were not federally recognized until 2007.  In fact, the Mashpees were not organized as a tribe in 1934, having giving up their tribal existence no later than 1869. An Indian tribe is only  "under federal jurisdiction" for purposes relevant here if the federal government exercised responsibility for or had an obligation to them in 1934.  The federal government demonstrated no such obligation to the Mashpees in 1934.  Thus, under the Supreme Court's decision in *Carcieri*, the Mashpees are not "Indian" pursuant to the "under Federal jurisdiction" definition set forth in the IRA, 25 U.S.C. § 5129.

**PARTIES AND STANDING**

8.      Plaintiffs are residents of the City of Taunton and live close to the casino development site.

9.      Plaintiffs David Littlefield and Michelle Littlefield reside at 192 Erin Road, East Taunton, Massachusetts.

10.     Plaintiff Tracey Acord resides at 106 Sagamore Road, East Taunton, Massachusetts.

11.     Plaintiffs Deborah Canary and Francis Canary, Jr. reside at 1059 Middleboro Avenue, East Taunton, Massachusetts.

12.     Plaintiff Veronica Casey resides at 32 Stevens Street, East Taunton, Massachusetts.

13.     Plaintiff Patricia Colbert resides at 148 Caswell Street, East Taunton, Massachusetts.

14.     Plaintiffs Vivian Courcy and Will Courcy reside at 170 Seekell Street, East Taunton, Massachusetts.

15.     Plaintiffs Donna DeFaria and Antonio DeFaria reside at 12 Middleboro Avenue, East Taunton, Massachusetts.

16.     Plaintiffs Kim Dorsey and Kelly Dorsey reside at 44 Woodlawn Street, East Taunton, Massachusetts.

17.     Plaintiffs Francis Lagace and Jill Lagace reside at 36 Stevens Street, East Taunton, Massachusetts.

18.     Plaintiffs David Lewry and Kathleen Lewry reside at 54 Middleboro Avenue, East Taunton, Massachusetts.

19.     Plaintiffs Michele Lewry and Richard Lewry reside at 76 Middleboro Avenue, East Taunton, Massachusetts.

20.     Plaintiff Robert Lincoln resides at 66 Bluejay Lane, East Taunton, Massachusetts.

21.     Plaintiff Christina Almeida resides at 158 Bluejay Lane, East Taunton, Massachusetts.

22.     Plaintiff Carol Murphy resides at 66 Colonial Drive, East Taunton, Massachusetts.

23.     Plaintiff Dorothy Peirce resides at 155 Cotley Street, East Taunton, Massachusetts.

24.     Plaintiff David Purdy resides at 61 Silvia Farm Drive, East Taunton, Massachusetts.

25.     Plaintiffs' injuries and grievances were caused, facilitated, or made possible by the activities of the Defendants that form the basis of this Complaint, and will be redressed by a ruling in their favor.

26.     Plaintiffs' interests fall within the zone of interests protected by the laws sought to be enforced in this action.

27.     Defendant Interior is a Cabinet-level department of the United States government. The BIA, an administrative agency within Interior, is specifically charged with administering the portions of the IRA at issue in this case, 25 U.S.C. § 5129.  Both Interior and BIA are headquartered in Washington, D.C.

28.     Defendant Debra A. Haaland is the Secretary of the Interior.  She is ultimately responsible for the implementation of the IRA, as well as oversight of BIA.  She is being sued in her official capacity only.

29.     Defendant Bryan Newland is the Assistant Secretary of the Interior for Indian Affairs.  Assistant Secretary Newland issued the 2021 ROD.  He is being sued in his official capacity only.

## JURISDICTION AND VENUE

30.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* (APA).  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 and may issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

31.     There exists an actual controversy between the parties.

32.    Judicial review of the 2021 ROD is authorized by the APA, as the 2021 ROD is a final agency action by Interior.

33.    Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), 28 U.S.C. §§ 1391(e)(2) and (3), and 5 U.S.C. § 703 because a substantial part of the events giving rise to the claims occurred in the District; the property that is the subject of the action is situated in the District; and Plaintiffs reside in the District.

## STATUTORY BACKGROUND

34.    Section 19 of the IRA defines who qualifies as an eligible "Indian" and presents three classes or categories of eligibility:

> The term "Indian" as used in the Act shall include [1] all persons of Indian descent who are members of any recognized tribe now under Federal jurisdiction; [2] and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and [3] shall further include all other persons of one-half or more Indian blood.

25 U.S.C. § 5129 (brackets added).

35.    In *Carcieri v. Salazar*, 555 U.S. 379 (2009), the U.S. Supreme Court construed the first definition of "Indian," *i.e.*, "persons of Indian descent" who were "now under Federal jurisdiction."  The Court held that when Congress passed the IRA in 1934, it intended "now" to mean 1934.  Thus, under *Carcieri*, only federally recognized tribes under federal jurisdiction in 1934 are eligible to receive IRA benefits and services, including fee-to-trust land acquisitions under Section 5.  25 U.S.C. § 5108.

36.    The *Carcieri* Court held that, based on "the evidence in the record," the Narrangansett Tribe was not "under Federal jurisdiction" in 1934 and therefore did not meet that definition of "Indian," as prescribed in the IRA.

37.    The IRA's legislative history shows that Congress in 1934 rejected an expansive understanding of eligibility so as to avoid overextending federal financial support obligations to

6

assimilated Indians, who like other citizens, already received governmental benefits from the state in which they resided.

38.     By way of example, Interior proposed a more expansive definition of "Indian" in its initial draft of the Indian Reorganization Act.   Congress narrowed the class of covered individuals not only by adding the "under federal jurisdiction" temporal requirement, but also by increasing the blood quantum requirement in the third definition of Indian, imposing a "one-half or more" blood quantum rather than the one-quarter blood quantum proposed by Interior.

39.     In implementing the IRA, Interior issued an administrative framework, DOI Solicitor's Opinion M-37029 (also known as the "M-Opinion"), which purported to interpret the phrase "now under Federal jurisdiction" in accordance with the Supreme Court's decision in *Carcieri.*  The M-Opinion lies in tension with the IRA's legislative history and *Carcieri* because it fails to give meaning to the temporal limitation codified in the phrase "under Federal jurisdiction," and improperly sweeps into the definition of "Indian" tribes that (a) were not federal treaty tribes; (b) never benefitted from any Congressional tribe-specific appropriations; and (c) never had members enrolled in the Office of Indian Affairs.

## THE TRIBE'S EFFORTS AT OBTAINING LAND-IN-TRUST

40.     Members of Eastern tribes and tribal remnants, like the Narragansetts and Mashpees, were not "under Federal jurisdiction" in 1934.   The members of these tribes were assimilated citizens of the state in which they resided and were cared for by their respective state governments without the support of the federal government.

41.     Nevertheless, the Mashpees have attempted to qualify for trust land under the IRA since 2007, but began the process of seeking federal recognition even earlier, in 1975.

<u>The Mashpees' Prior Unsuccessful Lawsuits to Obtain Tribal Recognition and Recover Possession of Tribal Lands</u>

42.     A group claiming to be the "Mashpee Tribe of Indians" filed suit in federal district court in Massachusetts in 1975 seeking to recover possession of tribal lands in Southeastern Massachusetts, purportedly taken unlawfully by the Commonwealth in the 19th Century.  The so-called "Mashpee Tribe of Indians" named as defendants the Town of Mashpee and the Commonwealth.  After a 40-day jury trial, with extensive testimony and written reports provided by ethno-historians concerning the history of the tribe, the jury determined the Mashpees had ceased to exist as a tribe by 1869.  *Mashpee Tribe v. Town of Mashpee*, 447 F. Supp. 940, 942 (D. Mass. 1978) (special interrogatory "d").

43.     The federal court trial record included evidence that the Mashpees desired to become citizens of the Commonwealth, petitioned for the right to secure such status, and in fact voted to become state citizens after passage of an act on June 23, 1869, which granted "citizenship to the Indians, removing their legal disabilities, and released the restraints on alienation."  *Id*.

44.     The federal district court judge overseeing the trial concluded that "from all the evidence, the jury was entitled to find that tribal identity had been abandoned at some time between 1842 and 1869."  *Id*. at 946.

45.     The district court dismissed the related land claims which required the Mashpees to prove (among other things) that it was a tribe at that time of filing the land claim lawsuit.

46.     The jury's findings and the district court's dismissal of the land claims were affirmed on appeal.  *Mashpee Tribe v. Town of Mashpee,* 592 F.2d 575 (1st Cir. 1979).

47.     The same group of Indians commenced a series of follow-on lawsuits also claiming to be the Mashpee Tribe, including land claims against the federal government.  These claims were rejected by both the district court and court of appeals as improper efforts to re-litigate matters

8

resolved against the group by the jury's finding in 1978 that they were not a tribe.  *See Mashpee v. Wolff*, 542 F. Supp. 797 (D. Mass. 1982), *aff'd* 707 F.2d 23 (1st Cir. 1983); *see also Mashpee Tribe v. Secretary of the Interior*, 820 F.2d 480, 482-83 (1st Cir. 1987) (affirming dismissal of further lawsuit by Mashpee Tribe on res judicata grounds and holding that the other plaintiff-tribes (Christiantowns, Chappaquiddicks, Herring Ponds and Troys) lost tribal identity in late 1800s just like the Mashpees).

48.     In *Mashpee Tribe v. Secretary of the Interior*, 820 F.2d at 482, Interior successfully invoked the defense of res judicata citing the 1978 jury determination adverse to the Mashpees' claim to be a tribe, and thereby established a complete defense to the Mashpees' land claims against the federal government.

<u>The Mashpees' 2007 Fee-to-Trust Application and Reservation Shopping</u>

49.     The Mashpees obtained federal recognition as a tribe in 2007.

50.     Soon thereafter, the Tribe submitted an application to Interior seeking to establish an initial reservation within the meaning of IGRA to support a casino (hereafter "casino reservation").

51.     The Mashpees first applied for a casino reservation in Middleboro by application dated August 20, 2007.

52.     The Mashpees amended their application to switch the casino reservation to Fall River, by amended application dated July 13, 2010.  That application was removed from review by the BIA in January 2012.

53.     The Mashpees then reapplied for a casino reservation in Taunton on June 5, 2012.

54.     In each application and amended application, the Mashpees requested that the Secretary take into trust 170 acres located in the Town of Mashpee, with each application

identifying those lands as the Tribe's home base where tribal offices, tribal museum, tribal Meeting House, tribal parsonage, and other tribal resources were based.

55.    Middleboro is located 42 miles from the Town of Mashpee.

56.    Fall River is located 53 miles from the Town of Mashpee.

57.    The City of Taunton is located 50 miles from the Town of Mashpee.

58.    The Mashpees' serial applications for a casino reservation distant from their homelands on the Cape show that the Mashpees were engaged in transparent "reservation shopping," looking for the best economic deal without any concern for what historical evidence might connect the Tribe to any particular location.

59.    Starting in 2012, the Mashpees submitted voluminous historical evidence and argument to Interior as to why they qualify for trust land under the first definition of "Indian."  In doing so, the Tribe failed to explain why *Carcieri* did not preclude the Tribe from qualifying under the "under Federal jurisdiction" definition of "Indian" articulated in the IRA.  That is particularly relevant given that the Mashpees are substantially similar to the Narragansetts.

60.    From 2012 to September 2018, Interior reviewed the Mashpees' historical evidence and arguments for eligibility under the first definition, and was not persuaded, even under the construction of "under Federal jurisdiction" set out in the M-Opinion, which lies in tension with *Carcieri* and distorts the IRA's plain meaning and legislative history.  The Secretary eventually concluded in a Record of Decision dated September 7, 2018, applying the M-Opinion, that the Mashpees failed to show they were under Federal jurisdiction in 1934.

61.    At every step of that administrative process, spanning six years and two administrations, the Mashpees presented the same evidence:   consisting of inconsequential

"factoids" such as 19th century federal reports and studies that resulted in *no action* by the federal government with respect to the Mashpees.

62.     Throughout the years, the Mashpees have also pointed to the fact that a handful of Mashpee children attended a federal boarding school in Carlisle, Pennsylvania that closed in 1918. When the Tribe presented that evidence before two other Secretaries of Interior prior to the 2021 ROD, the evidence was deemed inadequate.  The school, after all, was closed 16 years before the IRA was enacted.  The 2021 ROD later backtracked from the prior determinations about the relevance (or lack thereof) of the Carlisle school evidence, without any explanation.

63.     As the former Secretary found, the attendance of a handful of Mashpee children at the Carlisle school is not a jurisdiction conferring act over the Mashpee *Tribe*, even if the Mashpees were organized as a tribe at the time, which they were not.

## FEDERAL COURT LITIGATION AND REMAND

64.     While the 2015 ROD rejected the finding that the Tribe was "under Federal jurisdiction" in 1934, Interior nevertheless concluded in the 2015 ROD that the Tribe qualified as "Indian" under the IRA's second definition, *i.e.*, "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation."

65.     This Court set aside the 2015 ROD as it related to the second definition because Interior's application of the second definition was contrary to the plain terms of the IRA.  This Court remanded the 2015 ROD to Interior.  The First Circuit affirmed this Court's decision. *Littlefield v. U.S. Dep't of Interior*, 199 F. Supp. 3d 391 (D. Mass. 2016), *aff'd* 951 F.3d 30 (1st Cir. 2020).

66.     On remand, the Mashpees argued to Interior that it should qualify under the IRA's first definition—"under Federal jurisdiction"—and presented the same historical evidence and arguments as it had since 2012.  In a new Record of Decision issued in September 2018, the Secretary determined that the Mashpees qualified under *neither* the first definition of "Indian," *i.e.*, "under Federal jurisdiction" in 1934, nor the second definition ("2018 ROD").

67.     The Mashpees challenged the 2018 ROD in the United States District Court for the District of Columbia, contending that the 2018 ROD was arbitrary, capricious, and an abuse of discretion because the Secretary "ignored various facts and treated others in ways that deviated from both prior agency decisions and relevant caselaw, and on the whole failed to provide reasonable explanations for the way he treated evidence."  The D.C. district court granted summary judgment in favor of the Tribe, a decision that Interior chose not to pursue on appeal.  *Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199 (D.D.C. 2020).

68.     Plaintiffs were intervenor-defendants in the *Bernhardt* case, and could not appeal the decision due to the D.C. Circuit's remand rule.  Under that rule, a judicial decision that remands agency action back to the agency for reconsideration is considered non-final, and cannot be appealed by private intervenors alone.  *Sierra Club v. U.S. Dep't of Agric.*, 716 F.3d 653 (D.C. Cir. 2013).

**The 2021 ROD**

69.     On December 22, 2021, the Secretary issued the 2021 ROD "confirming" the 2015 ROD to take 321 acres of Mashpee-owned fee lands in trust:  151 acres in the City of Taunton and 170 acres in the Town of Mashpee.

70.     Without any change in the historical evidence presented by the Mashpees, without any change in the applicable legal standard (M-Opinion), and despite eight years of finding the

same historical evidence to be insufficient to show the Mashpees were under federal jurisdiction in 1934, the Secretary determined that the Tribe's evidence was sufficient to show that the Mashpees were "under Federal jurisdiction in 1934."

71.    The 2021 ROD did not address how the Mashpees could be found under federal jurisdiction when the Narragansetts were not.

72.    The 2021 ROD adopts almost verbatim the 2015 ROD except as to two sections.

73.    The 2021 ROD purports to find in the IRA (25 U.S.C. § 465) statutory authority for the Secretary of the Interior to take into trust the Mashpees' fee lands, specifically citing the first category of "Indian" under IRA Section 19 (despite the Secretary's disavowal of that category in 2015 ROD).

74.    The 2021 ROD takes as a given that Interior's 2007 decision to recognize the Mashpees as a tribe puts an end to any question about the Mashpees' tribal status for purpose of the IRA.  The Secretary does not explain in any meaningful way how the Mashpees can be viewed as a tribe under federal jurisdiction in 1934 for purposes of the IRA when they were first recognized by the Office of Federal Acknowledgement (OFA) in 2007 and lacked the necessary relationship with the federal government in 1934.

75.    The 2021 ROD also fails to address judicial pronouncements that the Mashpees stopped being a tribe sometime between 1842 and 1869, which is obviously material to whether a tribe was "under Federal jurisdiction" in 1934.  The Secretary's failure to explain (or at least to try to distinguish) the record in the 1978 federal trial, and failure to reconcile the results of that trial with Interior's contradictory recognition of the Tribe in 2007, leaves these two opposite pronouncements on the Mashpees' tribal status in 1934—judicial and administrative—unresolved.

76.     The 2021 ROD fails to support the Department's conclusion that the Mashpees qualify as a federally recognized tribe under federal jurisdiction in 1934 pursuant to the IRA.  The Mashpees did not meet their burden to prove that they (1) were tribally organized and exercised tribal jurisdiction over their lands and people in 1934, much less that they were recognized by the federal government for doing so; and (2) were under federal jurisdiction in 1934.  The 2021 ROD's conclusory administrative findings in support of tribal existence and identity in 1934— contradicted by judicial determinations by this Court that rest on contrary contentions presented to this Court by the Secretary—and those pointing to purported federal jurisdictional contacts are arbitrary and capricious, constitute an abuse of discretion, and are not in accordance with law.

## THE DESIGNATED LANDS

<u>The 151 Acres in Taunton</u>

77.     The lands in Taunton have been under the governance of the Commonwealth (and its political subdivisions) since the formation of the Commonwealth and its entry into the United States in 1788.

78.     Before 1788, the governing bodies respecting these same lands consisted of Colonial governments, British governors under authority of the Crown, and the Plymouth Colony.

79.     Taunton was founded by settlers from England and officially incorporated as a town on September 3, 1639.  Most of the town's settlers were originally from Taunton in Somerset, England, which led early settlers to name the settlement after that town.

80.     No tribal body has exercised tribal governmental authority over these lands for over three hundred years.

81.     Until the issuance of the 2015 ROD, the City of Taunton exercised taxing and regulatory authority over the lands, including subjecting the lands to the City's zoning and land use laws.

82.     In or about 2002, the Taunton Development Corporation (TDC), a non-profit private corporation organized to promote economic development in Taunton, acquired fee title to the lands.

83.     The City of Taunton zoned the Taunton lands for economic development and approved a garden-type warehouse development in 2003.  The low-rise profile of the warehouse buildings, together with tree lines and buffers, provided visual separation between the warehouse complex and nearby homes.

84.     On October 30, 2015, the TDC conveyed the subject lands to the Mashpees.

85.     On November 10, 2015, the Mashpees conveyed the subject lands to the United States to be held in trust.

<u>The 170 Acres in the Town of Mashpee</u>

86.     The Town of Mashpee was incorporated as a Town under the laws of the Commonwealth in 1870.

87.     For the past 145 years the Mashpees' landholdings in the Town of Mashpee have been under the regulatory authority of the Commonwealth and its political subdivisions.

88.     Unlike Taunton, the Town of Mashpee has had a significant Indian character, and constitutes the Mashpees' home, with tribal offices, historic buildings, and burial grounds located there.

89.     The Town of Mashpee was founded in the 17th Century as a Christian "praying town"—a religious community for Indians—where evangelical Christians invited Indians to reside

and learn about Christianity and convert to the same, and were subject to the Christian settlers' oversight.

90.     The Mashpees did not exercise plenary tribal jurisdiction over the lands in the Town of Mashpee.  Any purported exercise of governance by the Mashpees within the Town of Mashpee was subject to the control of Christian overseers, Colonial governments, the British Crown, and finally the Commonwealth.

91.     The federal government never set aside any lands as a reservation for the Mashpees.

92.     The federal government never superintended any lands held by the Mashpees.

93.     The Mashpees have been under state jurisdiction since the United States was established.

### The 2021 ROD's Harmful Consequences

94.     The creation of an Indian reservation—a federally created sovereign Indian enclave in the middle of Southeastern Massachusetts—complete with a tribal resort-casino, will forever change, in a unique fashion, the character and governance of the area.  It will create a tax-exempt, regulation-free zone for tribal development that will impose a host of substantial negative impacts on area residents while simultaneously taking away the ability of affected property-owners to petition their elected officials to provide meaningful mitigation through local land use and zoning laws.

95.     In stark contrast to a commercial operation, the residents will have no local or state recourse to address the harmful impacts resulting from the Mashpees' casino-resort development, which include, but are not limited to:  traffic congestion and heightened exposure to motor vehicle fumes associated with 5.3 million visitors annually (2015 ROD at 27) resulting in more than 10,000 incoming vehicle trips each day.  2015 ROD at 33 (casino operations "will increase in daily vehicle

trips on local/regional roads, resulting in additional emissions of VOC, NOx, ground-level $CO_2$ and GHGs"). Likewise, Plaintiffs have no local or state recourse to address other negative impacts from the tribal casino-resort's operations, such as the facility's 24-hour operations and associated noise and light pollution (including from outdoor lighting for safety); surface water runoff; flooding due to changes in streams, dams and other water control devices on the property; groundwater depletion and pollution impacting community water wells; and aesthetic harm in the form of grossly out-of-character, high-rise buildings located in a quiet residential area.

96.     The creation of an Indian reservation in Taunton, over which the Mashpees exercise sovereign authority with the right to undertake any and all commercial and industrial activity on the land free of state and local laws, will reduce residential property values.

97.     Prior to the 2015 ROD, the existing commercial site was regulated by the City of Taunton and consisted of an aesthetically unobtrusive, low-density "garden-type" industrial park, which was home to several low-rise warehouses hidden below the tree line. The warehouses and warehousing operations did not visually or otherwise intrude on the residential areas next to them. These appropriately scaled commercial buildings were razed in order to build a large destination resort-casino with high-rise towers and parking structures and lots for 6,000 vehicles, and is expected to draw more than 5 million visitors each year—all beyond state and local regulation.

98.     The conversion of the industrial park to an Indian reservation also means the loss of tax revenue from the warehouse operations on the land. This will produce a $375,000 loss in tax revenue each year for the residents of Taunton.

99.     The conversion of the City-zoned industrial park to a reservation leaves nearby residents unprotected from all development of the land, as there would be no government body— local, state or federal—with jurisdiction to address their concerns.

100.     The Mashpees undertook a public groundbreaking at the Taunton site in April 2016, demolished all buildings on site, and started foundation work with the goal to open a tribal casino in mid-2017.

101.     Due to this Court's 2016 ruling on whether the Mashpees were eligible under the second definition of "Indian," *see* para. 65, *supra*, construction on the site stopped.  All equipment and materials were removed from the site.

102.     As of the date of the filing of this Complaint, the site remains vacant.

103.     Since the issuance of the 2021 ROD, the Mashpees have made public statements indicating that they remain interested in exploring the use of the Taunton parcel for gaming.

104.     Plaintiffs each will be directly harmed by the development of the site as a tribal casino-resort including by unmitigated traffic congestion, air pollution, noise pollution, water pollution, and light pollution, and each will bear the visual and aesthetic impacts of this major alteration in the use and occupancy of the nearby property, all to their economic detriment.

## FIRST CAUSE OF ACTION

(The Secretary Lacks Statutory Authority to Take Land into Trust for the Mashpees
Because the Mashpees Are Not Eligible Under the IRA)

105.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 104 as if fully set forth herein.

106.     The Mashpees have been under the jurisdiction of the Commonwealth of Massachusetts since 1788, and before that, Colonial governments.

107.     The Mashpees never entered into a treaty with the federal government.

108.     The Mashpees were not organized as a tribe in 1934.

109.     The Mashpees abandoned their tribal identity between 1842 and 1869, as expressly determined by this Court in 1978 and affirmed by the First Circuit.

110.     Whatever Mashpees (tribal or non-tribal) were living in Massachusetts in 1934 were assimilated citizens were under state jurisdiction and not under federal jurisdiction.

111.     The Mashpees' members were not registered or enrolled as a tribe with the federal Office of Indian Affairs in 1934.

112.     The federal government provided no oversight over the Mashpees' lands in Massachusetts.

113.     The federal government did not consider the Mashpees eligible for benefits under the IRA in 1934, and specifically did not give the Mashpees the opportunity to organize as a tribe under the IRA in 1934.

114.     The Mashpees never asked for, and never received, the right to cast a vote under the IRA, to organize as a tribe, and to obtain IRA benefits.

115.     Before, during, and after the passage of the IRA, Interior repeatedly disclaimed federal jurisdiction over Massachusetts Indians, including the Mashpees, determining these Indians were instead under state jurisdiction.

116.     The Mashpees' "Plantation" was not a reservation within the meaning of the IRA, inasmuch as the lands were not federally set aside or superintended.

117.     The Mashpees did not exercise tribal jurisdiction over the Designated Lands in 1934.

118.     The 2021 ROD applies a legally incorrect definition of "Indian" under the IRA, as the Mashpees were not "under Federal jurisdiction" in 1934.

119.     The 2021 ROD applies a legally incorrect definition of Indian "reservation" under the IRA, as the Mashpees' lands were not federally set aside or superintended.

120.     The 2021 ROD applies a legally incorrect definition of "tribe" under the IRA.

121.   The Mashpees were not a federally recognized tribe under federal jurisdiction in 1934.

122.   The 2021 ROD is contrary to the Supreme Court's decision in *Carcieri*.

123.   The conclusions that Interior reached in the 2021 ROD misread and misinterpret the legislative history of the IRA.

124.   The 2021 ROD contradicts the plain meaning of Section 19 of the IRA, 25 U.S.C. § 5129.

125.   The 2021 ROD's conclusion that the Mashpees are eligible for fee-to-trust land acquisitions under the IRA is legally flawed, not in accordance with law, arbitrary and capricious, and constitutes an abuse of discretion.  *See* 5 U.S.C. § 706(a)(2).

## SECOND CAUSE OF ACTION

(The 2021 ROD Is Arbitrary, Capricious, Constitutes an Abuse of Discretion, and Is Not in Accordance with Law in Concluding that the Mashpees Demonstrated a Significant Historical Connection to Taunton)

126.   Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 125 as if fully set forth herein.

127.   The 2021 ROD's conclusion that the Taunton portion of the Designated Lands is located within an area where the Mashpees have significant historical connections (25 C.F.R § 292.6) lacks support in the record.  While the Mashpees maintained a consistent presence in the Town of Mashpee some fifty miles away, the 2021 ROD identifies no Mashpee connection to the 151 acres in question in Taunton, and the Mashpees offered little evidence of any connection to any lands in the surrounding area.  Other tribes that have claimed the Taunton lands are not and never have been Mashpee.

128.    Under the Secretary's regulations pertaining to gaming on newly acquired lands (25 C.F.R. pt. 292), a tribe must demonstrate a "significant historical connection" to the acquired lands before the tribe is eligible to use the land for gaming—to avoid "reservation shopping."

129.    The Mashpees' application demonstrated a significant historical connection to the Town of Mashpee, 50 miles distant from the City of Taunton.

130.    The Mashpees produced no evidence of a significant historical connection to the 151-acre parcel taken into trust by the Secretary in the City of Taunton.

131.    The Mashpees produced no physical evidence (burial site, artifacts or other evidence) demonstrating any connection to lands located within the boundaries of the City of Taunton.

132.    The 2021 ROD's conclusion that the Mashpees used lands located near Taunton for subsistence purposes rests on speculation and an improper legal standard.

133.    The artifacts collected from eleven miles away in the Town of Bridgewater are ambiguous as to tribal affiliation and are insufficient to establish the Mashpees' historical use of the lands in or near Taunton, as opposed to use by other Algonquin–speaking tribes in the area.

134.    In evaluating the historical connections of the Mashpees to the Taunton parcel, the 2021 ROD embraces a legally incorrect standard that relieves tribes of having to make a meaningful showing that the tribe (and not other Indians who occupied the area) had a significant historical connection to the area.

135.    The 2021 ROD misrepresents the historical record as to how the Mashpees fit within the larger group of Algonquin–speaking tribes.

136.    The Secretary appears to reason that since the Mashpees spoke the Algonquin language and were united with other Algonquin-speaking tribes in a larger affiliation of

Algonquin-speaking Indians known as the Wampanoag, historical findings of any one tribe inure to the benefit of any other tribe within that larger group for purposes of satisfying the requirement of a significant historical connection. That approach is inconsistent with how the federal government recognizes tribes; how ethno-historians classify tribes; and how Interior has analyzed "significant historical connections" for other tribes.

137.   The analysis employed in the 2021 ROD, and the conclusion reached in it with respect to the Mashpees' connection to Taunton, are unprecedented.

138.   The 2021 ROD's conclusion that the Mashpees demonstrated a significant historical connection to the acquired lands in Taunton is arbitrary, capricious, constitutes an abuse of discretion, and is not in accordance with law. *See* 5 U.S.C. § 706(a)(2).

### THIRD CAUSE OF ACTION

(The 2021 ROD Is Arbitrary, Capricious, Constitutes an Abuse of Discretion, and Is Contrary to Law in Concluding that the Two Physically Distant Acquisitions Represent the Mashpees' "Initial Reservation" for Purposes of the Indian Gaming Regulatory Act)

139.   Plaintiffs repeat and reallege the allegations of Paragraphs 1 to 138 as if fully set forth herein.

140.   The 2021 ROD declares the two physically separate trust acquisitions—151 acres in Taunton and 170 acres in Mashpee—as a single "initial reservation" for purposes of IGRA. That designation purports to bring both fee-to-trust acquisitions within an exception that permits Indian gaming on acquired lands notwithstanding IGRA's general prohibition against gaming on lands acquired after 1988.

141.   The 2021 ROD's treatment of the two physically separate trust acquisitions as a single reservation, despite being 50 miles distant from one other, is unprecedented.

142.    The 2021 ROD recites other cases where the Secretary of the Interior has declared noncontiguous parcels to be a single "initial reservation" but the Secretary has done so only upon finding that both parcels fall within the boundaries of a previously recognized treaty reservation.

143.    The Mashpees did not have a treaty reservation; no such reservation boundaries unite the two parcels in question here.

144.    The 2021 ROD's conclusion that the two Mashpee land acquisitions, 50 miles apart, constitute a single "initial reservation" under IGRA, is arbitrary and capricious, constitutes an abuse of discretion, and is not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter:

1.    A judgment declaring Defendants' actions in taking the subject lands into trust to be arbitrary and capricious, to constitute an abuse of discretion, and to be in excess of the Secretary's authority, and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(a)(2); and

2.    A judgment holding unlawful and setting aside the December 22, 2021 ROD and September 18, 2015 ROD which purport to: (a) acquire 151 acres of land, located in the City of Taunton, to be held in trust for the Mashpees under the IRA; and (b) declare such lands eligible for gaming as an "initial reservation" under IGRA—including expressly voiding the 2021 ROD's determinations that the land is held in trust for the Mashpees; constitutes an Indian reservation; constitutes an "initial reservation" for the Mashpees under IGRA; and is eligible for gaming under IGRA; and

3.    A declaratory judgment affirmatively "unwinding" all of the steps taken by the Defendants to change the status of the lands in Taunton, including requiring Defendants to return

the declared trust land to its non-trust, fee title status prior to the issuance of the 2015 ROD, and to rescind the Secretary's reservation proclamation; rescind the Secretary's "initial reservation" determination under IGRA, and otherwise rescind all determinations and directives in the 2021 and 2015 RODs respecting both how title to the land is held and what uses the land may be put to under IGRA; and

4.      A declaratory judgment that the Designated Lands are subject to state and local taxation and regulation just as they were prior to issuance of the ROD; and

5.      An award to Plaintiffs of their costs and disbursements, together with reasonable attorney's fees to the extent permitted by law, including, but not limited to the Equal Access to Justice Act; and

6.      Such other and further relief for Plaintiffs as this Court deems just, equitable and proper.

DATED:  February 18, 2022

Respectfully submitted,

*/s/ David J. Apfel*
David J. Apfel (BBO No. 551139)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel. +1 617 570 1895
Fax +1 617 321 4385
DApfel@goodwinlaw.com

David H. Tennant (admission *pro hac vice*
pending)
LAW OFFICE OF DAVID TENNANT PLLC
3349 Monroe Avenue, Suite 345
Rochester, New York 14618
(585) 281-6682
david.tennant@appellatezealot.com

*Attorneys for Plaintiffs*

## LOCAL RULE 40.1(g) STATEMENT REGARDING RELATED CASE

This case is related to *Littlefield v. U.S. Department of Interior*, No. 1:16-cv-10184-WGY (D. Mass.), which was before the Honorable William G. Young, for the following reasons: the cases (1) involve the same parties (except for the named federal officers, whose predecessors were named in the prior action), (2) involve "the same or similar claims," and (3) implicate the same agency reasoning, to the extent that the 2021 ROD incorporates the 2015 ROD.  While more than two years have elapsed since issuance of the judgment in the prior case, proceedings continued in the original *Littlefield* action well after issuance of the judgment, with the Court recently contemplating Plaintiffs' "commencement of a new action based on changed circumstances." Minute Order of Jan. 27, 2022, ECF No. 173, *Littlefield v. U.S. Dep't of Interior*, No. 1:16-cv-10184-WGY (D. Mass.).  Plaintiffs therefore respectfully submit that this case is related to the prior *Littlefield* action.

/s/ David J. Apfel
David J. Apfel