# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DAVID LITTLEFIELD, MICHELLE LITTLEFIELD, TRACY ACORD, DEBORAH CANARY, FRANCIS CANARY JR., VERONICA CASEY, PATRICIA COLBERT, VIVIAN COURCY, WILL COURCY, DONNA DeFARIA, ANTONIO DeFARIA, KIM DORSEY, KELLY DORSEY, FRANCIS LAGACE, JILL LAGACE, DAVID LEWRY, KATHLEEN LEWRY, MICHELE LEWRY, RICHARD LEWRY, ROBERT LINCOLN, CHRISTINA ALMEIDA, CAROL MURPHY, DOROTHY PEIRCE, and DAVID PURDY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) | Case No. 22-CV-10273-AK |
| v. | ) ) |  |
| UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA A. HAALAND, *in her official capacity as Secretary of the Interior*; BUREAU OF INDIAN AFFAIRS; and BRYAN NEWLAND, *in his official capacity as Assistant Secretary of the Interior for Indian Affairs*; | ) ) ) ) ) ) ) ) ) |  |
| Defendants, | ) ) |  |
| and | ) ) |  |
| MASHPEE WAMPANOAG TRIBE, | ) ) |  |
| Intervenor-Defendant. | ) ) |  |

## MEMORANDUM AND ORDER ON
## CROSS MOTIONS FOR SUMMARY JUDGMENT

**A. KELLEY, D.J.**

This is a challenge to a decision of the United States Secretary of the Interior (the

"Secretary")[1] brought under the Administrative Procedure Act.  In December 2021, the Secretary

issued a decision taking into trust, for the benefit of the Mashpee Wampanoag Tribe ("Mashpee"

or "Tribe"),[2] 321 acres of land located in southeastern Massachusetts (the "Designated Lands").

Plaintiffs are 23 residents of Taunton, Massachusetts, who live in the vicinity of a portion of the

Designated Lands.  They allege that the Secretary's decision was arbitrary, capricious, and

otherwise not in accordance with law.  The Tribe has intervened as a defendant.  On the parties'

cross-motions for summary judgment, the Court finds that the Secretary's decision was not

arbitrary and capricious, and will accordingly **GRANT** Defendants' motions [Dkts. 46, 48] and

**DENY** Plaintiffs' motion [Dkt. 45].

I.     **BACKGROUND**

A.  **The Mashpee and the Designated Lands**

The Mashpee are Indigenous people of North America whose historic lands include

southeastern Massachusetts and eastern Rhode Island.  As the Tribe notes in its briefing on these

motions, its "history, government, language and culture … predates the founding of the United

States."  [Dkt. 49 at 1]; see also Thanksgiving Day 2010, Proclamation No. 8606, 75 Fed. Reg.

74605 (Dec. 1, 2010) (recognizing that "the Wampanoag tribe … had been living and thriving

around Plymouth, Massachusetts for thousands of years" prior to European settlement).

---

[1] For convenience, this opinion attributes the actions of all federal parties, including the Department of the Interior, the Bureau of Indian Affairs, and the Assistant Secretary of the Interior for Indian Affairs, to Debra A. Haaland, the United States Secretary of the Interior, as she is the party who bears the ultimate responsibility for the decision under review.

[2] The present-day Mashpee Wampanoag Tribe is a legal successor to historic tribes known by many names, including the Pokanoket, the Mashpee, the Wampanoag, and the South Sea Tribe.  For convenience, this opinion refers to the present-day Mashpee Wampanoag Tribe and all of its recognized predecessors in interest as either the "Mashpee" or the "Tribe."

Annually, millions of Americans celebrate the Tribe's impact on this country's history through the Thanksgiving holiday.  See, e.g., Thanksgiving Day 2018, Proclamation No. 9827, 83 Fed. Reg. 61109 (Nov. 28, 2018) ("Members of the Wampanoag tribe—who had taught the Pilgrims how to farm in New England and helped them adjust and thrive in that new land—shared in the bounty and celebration"); Thanksgiving Day 2011, Proclamation No. 8755, 76 Fed. Reg. 72079 (Nov. 21, 2011) ("The feast honored the Wampanoag for generously extending their knowledge of local game and agriculture to the Pilgrims, and today we renew our gratitude to all American Indians and Alaska Natives."); Thanksgiving Day 1995, Proclamation No. 6849, 60 Fed. Reg. 57311 (Nov. 14, 1995) ("In 1621, Massachusetts Bay Governor William Bradford invited members of the neighboring Wampanoag tribe to join the Pilgrims as they celebrated their first harvest … More than 300 years later, the tradition inspired by that gathering continues on Thanksgiving Day across America—a holiday that unites citizens from every culture, race, and background.").

At the time of their first contact with Europeans in the 16th and 17th centuries, the Tribe's territory "comprised a group of allied villages in eastern Rhode Island and in southeastern Massachusetts." [Record of Decision, Dkt. 1-3 ("2021 ROD") at 40 (quoting Bert Salwen, Indians of S. N.E. and Long Isl.: Early Period in 15 HANDBOOK OF N. AM. INDIANS 160, 171 (1978))].  This land covered all of present-day Bristol County and Barnstable County, Massachusetts, including the towns of Taunton and Mashpee.  [Id. at 41].  At that time, present-day Taunton was known as the village of Cohannet.  [Id. at 41, 49].  The Mashpee were struck by an epidemic between 1617 and 1619 that resulted in extensive loss of life.  [Id. at 41].  After the English ship *Mayflower* arrived in Plymouth, Massachusetts, in 1620, tribal leadership

entered into a peace treaty with the Plymouth Colony, which was the first English political entity established in Massachusetts.  [See id.]

Between 1621 and 1670, the Mashpee sold or gave large tracts of land to English settlers. [Id.]  This included the sale of Cohannet, which the Plymouth Colony incorporated as the town of Taunton in 1639.  [Id. at 49].  In 1675, disputes around land use and land ownership led to a war between the English settlers and New England tribes, including the Mashpee.  [Id. at 42]. This conflict, now known as King Philip's War, resulted in large losses of life among the Mashpee.  [Id.]

After the war, most of the Mashpee residing in mainland Massachusetts dispersed, with some sold into slavery.  [Id.]  Many of those who remained coalesced into settlements organized by the English, [id.], including the town of Mashpee, which was formed from land deeded by individual tribal leaders to the Tribe in 1665 and 1666, [id. at 9].  In 1685, the colonial court confirmed these deeds and guaranteed that the land belonged to "said Indians, to be perpetually to them and their children," with a restriction on transfer to non-Mashpee without the assent of the entire Tribe.  [Id.]  The lands were initially governed by a six-person council of Mashpee, but the General Court of Massachusetts diluted tribal control in 1746 by appointing three non-Mashpee overseers.  [Id.]  In 1763, the General Court converted the land into a self-governing "Indian district."  [Id.]  Massachusetts terminated Mashpee control over this district in 1788, but restored it in 1834.  [Id.]  In 1869, Massachusetts eliminated the restriction on transfer of the land to non-Mashpee, and in 1870, the state incorporated the town of Mashpee, coterminous with the borders of the prior Indian district.  [Id. at 10].

The Tribe had 2,633 members in 2021.  [Id. at 52].  Of these members, 65 percent lived in Massachusetts, 40 percent lived in the town of Mashpee (where the Tribe is headquartered),

and over 60 percent lived within 50 miles of the land in Taunton that is the subject of this litigation.  [Id. at 52].

## B. Statutory and Interpretative History

Congress adopted the Indian Reorganization Act ("IRA") in 1934 "to change 'a century of oppression and paternalism' in the relationship between the United States and its native Indian tribes."  Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d 199, 207 (D.D.C. 2020) (quoting H.R. Rep. No. 73-1804, at 6 (1934)).  The statute's purpose is "to create the mechanisms whereby tribal governments could be reorganized and tribal corporate structures could be developed" and to facilitate the acquisition of reservation lands.  Id. (citations omitted).

The IRA authorizes the Secretary of the Interior "to acquire land and hold it in trust 'for the purpose of providing land for Indians.'"  Carcieri v. Salazar, 555 U.S. 379, 381–82 (2009) (quoting 25 U.SC. § 5108).  The Secretary may only take land into trust for persons or tribes that meet at least one of the statute's definitions of "Indian."  Littlefield v. Mashpee Wampanoag Tribe ("Littlefield II"), 951 F.3d 30 at 34 (1st Cir. 2020).  The IRA defines "Indian" as follows:

> The term "Indian" as used in this Act shall include [1] all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include [3] all other persons of one-half or more Indian blood.

25 U.S.C. § 5129 (bracketed numbers added).

The Supreme Court partially interpreted the IRA's first definition of "Indian"—the definition at issue in this action—in Carcieri, a challenge to the Secretary's power to take lands into trust for the Narragansett Tribe, whose traditional lands neighbor the Mashpees'.  The Supreme Court defined the term "now" in the phrase "now under Federal jurisdiction" as

referring to the date of the IRA's enactment in 1934.  Carcieri, 555 U.S. at 395.  In effect, Carcieri set 1934 as the reference date for all future litigation under the IRA's first definition of "Indian," requiring the Secretary to find that a tribe was "under Federal jurisdiction" in that year before exercising her authority under this provision to take land into trust.  See id.

Left unanswered by the Carcieri majority was the proper construction of the term "under Federal jurisdiction."  See Bernhardt, 466 F. Supp. 3d at 207.   In a concurring opinion, Justice Breyer detailed examples of tribes whom the federal government had erroneously concluded were not under its jurisdiction in 1934, but whom the government later recognized.  See Carcieri, 555 U.S. at 398–99 (Breyer, J., concurring) (citing examples of the Stillaguamish Tribe, Grand Traverse Band of Ottawa and Chippewa Indians, and Mole Lake Tribe).  Justice Breyer suggested that post-1934 federal recognition of a tribe could reflect pre-1934 "federal jurisdiction" such that the tribe could qualify under the IRA's first definition of "Indian."  Id. at 399.  He further outlined types of evidence that could imply "a 1934 relationship between [a tribe] and [the] Federal Government," including a treaty in effect in 1934, a pre-1934 congressional appropriation, and enrollment with the Indian Office prior to 1934.  Id.

After Carcieri, the Solicitor of the Department of the Interior ("the Department") published a memorandum ("the M-Opinion") establishing a framework for interpreting the phrase "under Federal jurisdiction."[3]  U.S. Dept. of Interior, M-37029, Memorandum on the Meaning of "Under Federal Jurisdiction" for Purposes of the IRA ("M-Opinion") (March 12, 2014).  The M-Opinion applies the familiar two-step interpretative process the Supreme Court delineated in Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984), first

---

[3] The Solicitor withdrew the M-Opinion in 2020, see U.S. Dept. of Interior, M-37055, but reinstated it on April 27, 2021, see U.S. Dept. of Interior, M-37070.  The M-Opinion was thus in force at the time of the ROD under review, which was published on December 22, 2021.

concluding that Congress had "left a gap for the agency to fill" in the statute's meaning, and then proposing an interpretation that is binding on the Secretary and the entire Department, including the Bureau of Indian Affairs ("BIA").[4]  Id. at 843–44; see M-Opinion at 4–5, 17.

The M-Opinion creates a two-part inquiry for determining whether a tribe was "under Federal jurisdiction" in 1934.  The Secretary first must determine whether there was a "sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction." Bernhardt, 466 F. Supp. 3d at 208–09; M-Opinion at 19.  To make this finding, the Secretary asks "whether the United States had, in 1934 or at some point in the tribe's history prior to 1934, taken an action or series of actions – through a course of dealings or other relevant acts for or on behalf of the tribe or in some instance tribal members – that are sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government."  Id.  This inquiry is "fact and tribe-specific," id., and the Secretary may afford different types of evidence different weight, Bernhardt, 466 F. Supp. 3d at 209.  The Secretary may consider "guardian-like action[s]" the government took on behalf of a tribe, including, but not limited to, negotiation of treaties, approval of contracts between the tribe and non-Indians, enforcement of federal commerce laws, the education of the tribe's children at BIA schools, and provision of federal health and social services to the tribe.  M-Opinion at 19.  If the Secretary concludes jurisdiction existed prior to 1934, the second step of her inquiry is to determine "whether the tribe's jurisdictional status remained intact in 1934."  Id.

---

[4] The D.C. Circuit upheld the M-Opinion's application of Chevron on a direct challenge to its validity, concluding that the Department was reasonable in concluding that the term "under Federal jurisdiction" was ambiguous, and that the two-part test it established to interpret the term was likewise reasonable.  Confederated Tribes of Grand Ronde Cmty. v. Jewell, 830 F.3d 552, 564–65 (D.C. Cir. 2016).  Neither the Supreme Court nor the First Circuit has considered the validity of the M-Opinion.

### C.  Procedural History

The parties have been litigating the lands in question for 16 years.  In 2007, the Secretary recognized the Mashpee as "an Indian tribe within the meaning of Federal law."  72 Fed. Reg. 8007-01 (Feb. 22, 2007).  Shortly after, the Tribe submitted a "fee-to-trust" application requesting that the Department acquire and take into trust the Designated Lands for purposes of establishing a reservation.  Littlefield II, 951 F.3d at 33.  At this time, the Tribe owned and operated the portion of the Designated Lands in the town of Mashpee, and planned to acquire the portion in Taunton.  Id.

In 2015, the Secretary issued a written decision granting the Tribe's application, and shortly thereafter took the Designated Lands into trust and proclaimed them to be the Tribe's reservation.  Id. at 33–34; see 81 Fed. Reg. 948 (Jan. 8, 2016).  The Secretary concluded that the Mashpee qualified as "Indians" within the meaning of the *second* definition of that term in the IRA: "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." 25 U.S.C. § 5129; Littlefield v. U.S. Dept. of Interior ("Littlefield I"), 199 F. Supp. 3d 391, 393 (D. Mass. 2016) (Young, J.). Plaintiffs, as neighbors to the Taunton parcel of land, filed suit in this district, arguing that the Secretary's decision exceeded statutory authority.  Littlefield I, 199 F. Supp. 3d at 393.  This district granted summary judgment for Plaintiffs, concluding that the Secretary had improperly construed the IRA's second definition of "Indian."  Id. at 398–400.  It remanded the matter to the Secretary for reconsideration of the Tribe's application, suggesting that the agency "analyze the Tribe's eligibility under the first definition of 'Indian.'"  Littlefield II, 951 F.3d at 34.

In 2018, the Secretary issued a second written decision ("the 2018 ROD") denying the Tribe's application, concluding that the Tribe did not qualify under the IRA's first definition of

"Indian" because it was not under federal jurisdiction in 1934.  Id.  The Tribe then sued the

Secretary in the U.S. District Court for the District of Columbia ("the D.C. district court"),

arguing that the Secretary's interpretation of the first definition of "Indian" was arbitrary,

capricious, and contrary to law.  Bernhardt, 466 F. Supp. 3d at 212.  The Plaintiffs to this action

intervened in the D.C. district court action as defendants.  See id. at 205.  Simultaneously, the

Tribe appealed the Littlefield I decision on the second definition of "Indian" to the First Circuit,

which affirmed the district court's interpretation of that definition to exclude the Tribe.

Littlefield II, 951 F.3d at 41.

　　　With the litigation concerning the Tribe's eligibility under the second definition

resolved,[5] the D.C. district court considered the Secretary's 2018 decision that the Tribe did not

qualify under the first definition.  That court vacated the decision, faulting the Secretary for

"evaluating the evidence in isolation and failing to view the probative evidence 'in concert,'" as

the M-Opinion requires.  See Bernhardt, 466 F. Supp. 3d at 218.  It further held that the

Secretary "improperly treated the Mashpee's evidence" by misapplying the M-Opinion's

standards to evidence concerning the education of Mashpee children at the federally-operated

Carlisle Indian School, the appearance of the Tribe on federal census rolls, and federal reports

and surveys regarding the Tribe.  Id. at 219–35.  The D.C. district court remanded the action to

the agency with instructions to "apply the two-part test in [the M-Opinion]—correctly this time."

Id. at 236.

　　　On remand, the Secretary issued a third written decision in December 2021 ("the 2021

ROD"), which is the decision under review here.  The 2021 ROD concluded that the Tribe had

been under federal jurisdiction in 1934 and thus qualified under the IRA's first definition of

---

[5] The Tribe did not appeal the First Circuit's decision to the Supreme Court.

"Indian."  The Secretary accordingly retook the Designated Lands into trust.  Plaintiffs, as they

had following the 2015 decision authorizing the Secretary to take the lands into trust, brought

suit in this district, again arguing that the Secretary's decision exceeded statutory authority.

[Dkt. 1].  The Mashpee timely moved to intervene as defendants.  [Dkt. 16].  The Secretary

moved to transfer the action to the D.C. district court, which had issued the most recent decision

remanding this matter to the agency.  [Dkt. 10].  This district denied that motion and further

concluded that this matter was not related to Littlefield I, the 2016 action between these parties

concerning the application of the second definition of "Indian" to the Tribe.  [Dkt. 27].  The case

was redrawn to this session, and the three parties—Plaintiffs, the Mashpee Wampanoag Tribe,

and the Secretary—filed the instant-cross motions for summary judgment.  Oral argument was

presented on January 13, 2023, and the Court took the matter under advisement.

## II.    STANDARDS OF LAW

Plaintiffs seek judicial review of the Secretary's decision under Chapter 7 of the

Administrative Procedure Act ("APA").  That statute provides that "the reviewing court shall

decide all relevant questions of law, interpret constitutional and statutory provisions, and

determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.

Where a party challenges an administrative action under the APA, "summary judgment ...

serves as the mechanism for deciding, as a matter of law, whether the agency action is supported

by the administrative record and otherwise consistent with the APA standard of review."

Minuteman Health, Inc. v. U.S. Dep't of Health & Human Servs., 291 F. Supp. 3d 174, 189–90

(D. Mass. 2018) (citation omitted).  Accordingly, the traditional Rule 56 standard does not apply;

rather, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review."

Boston Redevel. Auth. v. National Park Serv., 838 F.3d 42, 47 (1st Cir. 2016).  Courts do not

review the administrative record to determine whether a material dispute of fact remains, but rather ask "whether the agency action was arbitrary and capricious."  Id.; see 5 U.S.C. § 706 (directing courts to "hold unlawful and set aside agency action, findings, and conclusions" that they deem "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

The scope of judicial review under the arbitrary and capricious standard "is narrow[,] and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Rather, the court "must examine the evidence relied on by the agency and the reasons given for its decision," and determine whether it articulated "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Minuteman Health, 291 F. Supp. 3d at 190 (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).  This standard is "highly deferential," and accordingly, "courts should uphold an agency determination if it is 'supported by any rational view of the record.'"  Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 172 (1st Cir. 2021) (quoting Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015)).  Conversely, courts should reverse and remand where

> the agency (1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id. (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43) (numbers added).

## III.   DISCUSSION

The parties raise several issues in their cross-motions for summary judgment.  They first dispute the preclusive effect of prior litigation.  They also debate the validity of the M-Opinion.

Finally, they disagree as to whether the 2021 ROD taking the Designated Lands into trust for the Tribe was arbitrary, capricious, or contrary to law.

### A. Estoppel

The Court's first task is to determine the degree to which the questions the parties present have been preclusively resolved through their prior litigation. The Tribe argues that the doctrine of judicial estoppel bars Plaintiffs from challenging the validity of the M-Opinion in these proceedings, and that the related doctrine of collateral estoppel, or issue preclusion, bars relitigation of certain discrete lines of argument. The Court addresses each of the Tribe's estoppel-based arguments in turn.

### 1. Judicial Estoppel

Judicial estoppel provides that "where one succeeds in asserting a certain position in a legal proceeding, one may not assume a contrary position in a subsequent proceeding simply because one's interests have changed." Berkowitz v. Berkowitz, 817 F.3d 809, 813 (1st Cir. 2016). The purpose of this doctrine is to prevent parties from "playing fast and loose with the courts." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). The party asserting judicial estoppel must show that the opposing party has taken a position that is "mutually exclusive" with its prior position, and that the party succeeded in persuading a court to adopt that prior position. See id.

The Tribe argues that Plaintiffs are barred from contesting the validity of the current version of the M-Opinion here because Plaintiffs conceded the opinion's validity in the D.C. district court proceedings. However, a review of the D.C. district court's opinion indicates that the validity of the M-Opinion was not made an issue in that case. Although Plaintiffs "defend[ed] the Secretary's use of the M-Opinion" in that action, Bernhardt, 466 F. Supp. 3d at

216, no party challenged the Secretary's reliance on the opinion, see id.  Instead, the D.C. district court made clear that its analysis was limited to the Secretary's application of the M-Opinion, and not to the opinion itself.  Id. at 217 ("This is the question before the Court: whether the Secretary's application of its interpretation of the IRA – the M-Opinion – was arbitrary and capricious." (emphasis in original)).

Because the validity of the M-Opinion was not at issue in the D.C. district court action, Plaintiffs cannot be said to have "succeeded" in asserting its validity there.  Thus, they are not judicially estopped from contesting its validity here.

### 2. Collateral Estoppel

 Collateral estoppel, or issue preclusion, applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment … in a subsequent action between the parties, whether on the same or a different claim."  B&B Hardware, Inc. v. Hagris Indus., Inc., 575 U.S. 138, 148 (2015).  Here, two prior actions between these parties have been litigated to a valid and final judgment: the action in this district concerning the second definition of "Indian" (Littlefield I) and the D.C. district court action concerning the first definition of "Indian" (Bernhardt).  Accordingly, any issues of fact or law actually litigated and determined in either of these proceedings that was essential to a final judgment may not be relitigated here.  The Tribe specifically argues that the D.C. district court resolved a number of arguments that Plaintiffs raise here.

First, they contend, Plaintiffs argued in Bernhardt that the Supreme Court's decision in Carcieri mandates a finding that the Mashpee were not under federal jurisdiction in 1934.  See Bernhardt, 466 F. Supp. 3d at 215 n.9.  Plaintiffs raise this argument again here; in both actions, their position has been that any lower court decision recognizing the Mashpee under the IRA is

fundamentally inconsistent with the Supreme Court's holding in Carcieri excluding the Narragansett tribe from recognition under the IRA.  See id.; [Dkt. 45 at 9].  Plaintiffs' argument proceeds on the theory that the Narragansett and Mashpee, who are neighboring tribes in Southern New England with ancestral lands divided by Narragansett Bay, present functionally identical cases for recognition.  They posit that if the Supreme Court held that the Narragansett presented evidence insufficient to establish that they were under federal jurisdiction in 1934, no such evidence could be sufficient for the Mashpee.

The D.C. district court rejected this argument, noting that the parties to Carcieri did not contest whether the Narragansett had been under federal jurisdiction in 1934.  Bernhardt, 466 F. Supp. 3d at 215 n.9.  Accordingly, the Supreme Court had merely accepted without deciding that the Narragansett were not under jurisdiction at the time the IRA was exacted, see Carcieri, 555 U.S. 395–96, and two Justices wrote separately to state that they would have remanded the matter to the Secretary for factfinding on this question, id. at 400–01 (Souter, J., dissenting).  Indeed, the argument the Secretary and the Narragansett pursued in Carcieri was that the word "now" in the statutory term "now under Federal jurisdiction" referred to the year *1998*, not 1934. Id. at 382.  The underlying factfinding in Carcieri had concerned the Narragansett's status in 1998, not 1934, so that decision is not binding as to the Narragansett's status in 1934.

This Court affords preclusive effect to Bernhardt's rejection of the Narragansett comparator argument.  Although Bernhardt addressed this argument in a footnote, it provided full reasoning for its rejection of Plaintiffs' reading of Carcieri, see Bernhardt, 466 F. Supp. 3d at 215 n.9, and the reasoning was essential to its conclusion, as the court could not have ruled in favor of the Mashpee had it concluded that Carcieri foreclosed their argument.  Thus, the prior

litigation on this argument meets all required elements for issue preclusion.[6]  The Court considers the Narragansett comparator argument fully litigated and resolved.

Plaintiffs and the Tribe also disagree over the extent to which Bernhardt precludes Plaintiffs' arguments about the Secretary's reliance on evidence concerning Mashpee children's attendance at the Carlisle School and the potential for evidence to demonstrate that the Tribe was under concurrent state and federal jurisdiction.  Bernhardt held that the M-Opinion requires the Secretary to consider evidence of Mashpee children's attendance at the Carlisle School as probative of "guardian-like action" taken by the federal government on behalf of the Tribe as a whole.  466 F. Supp. 3d at 219–23.  To the extent Plaintiffs argue the Secretary erred in considering this evidence (as Bernhardt held that the M-Opinion directs her to), they would be precluded.  However, Plaintiffs frame their arguments here as challenges only to the Secretary's weighing of this evidence, which are permissible.

Likewise, the Tribe suggests that Plaintiffs are precluded from arguing that the Tribe's status as "under state jurisdiction" forecloses the possibility of it also having been under federal jurisdiction.  The D.C. district court's opinion does not, however, suggest that this line of argument was thoroughly litigated in that matter.  That court agreed, at the Tribe's request, to consider evidence "that Massachusetts' actions toward the Tribe supplemented the federal government's assertion of jurisdiction and should be considered as part of the federal course of dealings," id. at 216, but these considerations do not preclude Plaintiffs from arguing here that the Tribe could not have been under both state and federal jurisdiction.

---

[6] The Court notes that—in addition to being preclusive—Bernhardt's reading of Carcieri's limited holding is *correct*, and further notes that the voluminous evidence in the Carcieri record concerning the Narragansett's history is not in the administrative record in this case.  Without access to this evidence, the Court would have had no basis to evaluate Plaintiffs' position that the Narragansett and Mashpee present identical cases for recognition under the IRA.  The Court is aware of no opinion holding that the tribes' history and circumstances are identical.

### B. Validity of the M-Opinion

Having concluded that Plaintiffs are not estopped from challenging the validity of the M-Opinion, the Court now turns to that challenge.  Courts evaluate agencies' construction of statutes under the two-step <u>Chevron</u> framework.  The Court first asks "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter." <u>Chevron</u>, 467 U.S. at 842.  The agency's conclusion as to the existence of ambiguity in the statute receives no deference. <u>Littlefield I</u>, 199 F. Supp. 3d at 395.  However, if the Court concludes that there is ambiguity, it "must defer to the agency's interpretation, so long as it is 'rational and consistent with the statute.'" <u>Id.</u> (quoting <u>Sullivan v. Everhart</u>, 494 U.S. 83, 89 (1990)).  The First Circuit has described this standard of scrutiny as "de novo review, but with some deference to the agency's reasonable interpretation of statutes and regulations that fall within its sphere of authority." <u>Jianli Chen v. Holder</u>, 703 F.3d 17, 21 (1st Cir. 2012); <u>see</u> <u>Littlefield I</u>, 199 F. Supp. 3d at 394–95 (reconciling First Circuit's concept of "de novo review … with some deference" with <u>Chevron</u> and broader principles of de novo review).

Plaintiffs argue that the M-Opinion creates "a standardless test that practically any tribe can meet," and that it is irreconcilable with the Supreme Court's decision in <u>Carcieri</u>.  [Dkt. 45 at 32].  They view the M-Opinion's two-part inquiry into whether the federal government had conferred jurisdiction on a tribe before 1934 and, if so, whether that jurisdiction remained extant in 1934, as contrary to <u>Carcieri</u>'s requirement that the jurisdiction-conferring event be in effect in 1934.  [<u>Id.</u>]

The M-Opinion withstands scrutiny under both <u>Carcieri</u> and the <u>Chevron</u> framework.  Plaintiffs' assertion, [Dkt. 45 at 32], that the M-Opinion disregards <u>Carcieri</u>'s holding that a tribe must have remained under federal jurisdiction in 1934 is a misreading of both opinions.  The

second step of the M-Opinion's inquiry requires the Secretary to determine "whether the tribe's jurisdictional status remained intact in 1934." M-Opinion at 19. Carcieri's holding is limited to interpreting the word "now" in the IRA to refer to the date of the statute's enactment in 1934. 555 U.S. at 395; see id. at 396 ("Under our rules, that alone is reason to accept this as fact for purposes of our decision in this case."). The Supreme Court's decision leaves open the question of how the Secretary may determine jurisdiction existed in 1934, and in no way forecloses the M-Opinion's two-part inquiry for evaluating such claims of jurisdiction.

Further, Plaintiffs raise no meaningful challenge to the validity of the M-Opinion under the Chevron framework. The first step of this framework is to determine whether there is ambiguity to the term at issue—here, "under Federal jurisdiction." Justice Breyer strongly suggested that this term was ambiguous in his concurrence to Carcieri, id. at 398 (Breyer, J., concurring), and each of the three appellate courts to have considered the term have agreed. County of Amador v. U.S. Dep't of Interior, 872 F.3d 1012, 1021 (9th Cir. 2017); Confederated Tribes of Grand Ronde Cmty. v. Jewell, 830 F.3d 552, 564 (D.C. Cir. 2016); see Rape v. Poarch Band of Creek Indians, 250 So.3d 547, 560 n.7 (Ala. 2017). This Court agrees that more than one reasonable construction of the term "under Federal jurisdiction" exists, and the term is thus ambiguous within the meaning of Chevron.

Turning to the second Chevron step, this Court agrees with the D.C. Circuit's conclusion in Grand Ronde that the M-Opinion's construction of "under Federal jurisdiction" is reasonable. 830 F.3d at 564–65. As the term "jurisdiction" is "of extraordinary breadth," id. at 564, the M-Opinion's context-driven, tribe-by-tribe interpretation of the term is permissible. See also County of Amador, 872 F.3d at 1026 (describing "jurisdiction," as it is used in the IRA, as "a word of many, too many, meanings"). Moreover, the M-Opinion adopts and expands upon

Justice Breyer's suggested interpretation of the term in his <u>Carcieri</u> concurrence.  Justice Breyer suggested that evidence of jurisdiction could include treaties with the United States, congressional appropriations, and enrollment with the federal Indian Office.  <u>Carcieri</u>, 555 U.S. at 399 (Breyer, J., concurring).  To these suggestions, the M-Opinion adds approval of contracts between the tribe and non-Indians, enforcement of federal commerce laws against the tribe, federally funded education of the tribe's children, and provision of federal health and social services to the tribe.  <u>M-Opinion</u> at 19.  The conjunctive, holistic, and tribe-specific inquiry the opinion prescribes to resolve the question of jurisdiction is a reasonable interpretation of the statute's use of that term and is consistent with <u>Carcieri</u>'s treatment of the statute.

Accordingly, the Court grants deference to the M-Opinion's construction of the phrase "under Federal jurisdiction."  Because the M-Opinion is binding on the Secretary, the Court uses the M-Opinion as the benchmark by which it evaluates the decision under review.  <u>See</u> <u>Bernhardt</u>, 466 F. Supp. 3d at 236 (deeming the Secretary's previous decision "arbitrary, capricious, an abuse of discretion, and contrary to law" because the Secretary had failed to correctly apply M-Opinion's two-part test).

### C.  APA Review of the 2021 ROD

The Court now turns to the ultimate question at bar, that of whether the 2021 ROD taking the Designated Lands into trust for the Tribe was arbitrary, capricious, or contrary to law.  Plaintiffs make four principal challenges to the 2021 ROD.  First, they allege that the ROD constructed a "false narrative" about Mashpee children's attendance at the Carlisle school that intentionally misrepresents the historical record.  [Dkt. 45 at 14–19].  Second, they allege that prior case law is inconsistent with the ROD's conclusion.  [<u>Id.</u> at 19–22].  Third, they argue that various record evidence the Secretary considered is not probative.  [<u>Id.</u> at 23–31].  And fourth,

they allege that the Secretary's creation of a reservation comprised of two noncontiguous parcels of land was unlawful.  [Id. at 33–34].  Each of these arguments is addressed in turn.

### 1.  Carlisle School Evidence

The Carlisle Indian School was a non-reservation boarding school in Carlisle, Pennsylvania, for Indigenous children operated by the BIA.  See Bernhardt, 466 F. Supp. 3d at 219.  The Secretary made extensive findings of fact concerning this school in the 2021 ROD; the Court briefly summarizes the relevant evidence the Secretary relied upon below.

The Carlisle School was a part of the federal government's longstanding "civilization" policy that "sought to eliminate Indian culture."  [2021 ROD at 16].  The federal government ceased making treaties with Indigenous tribes in 1871 and began to instead pursue forcible assimilation.  [Id.]  The government's goal was to "detribalize" Native Americans through "division of communally held tribal land."  [Id. (quoting Addie C. Rolnick, Assimilation, Removal, Discipline, and Confinement: Native Girls and Government Intervention, 11 Colum. J. Race & L. 811, 826–27 (2021))].  An essential component of this policy was the forcible introduction of children to "the American educational, child welfare, and juvenile justice systems."  [Id.]

The government established a nationwide policy "that Native children should be removed from their homes and placed in church or government-run boarding schools."  [Id.]  Between the late 19th and mid-20th century, thousands of children were separated from their families and institutionalized in government-run boarding schools like the Carlisle School.  [Id.]  These schools' mission was to "'civilize' Native children by forcing them to adopt the norms of Christian Anglo-American culture."  [Id. at 17].  The schools punished Native children for speaking their languages and engaging in any non-Christian religious or spiritual practices.  [Id.]

In addition to this forced assimilation to the government's language and religious norms, some students at the Carlisle School were made to adopt new names, clothing, haircuts, and cultural practices.  [Id.]

Thus, the purpose of the Carlisle School and similar off-reservation boarding schools was, as the Commissioner of Indian Affairs wrote in 1896, "for the strong arm of the nation to reach out, take [Indian children] in their infancy and place them in its fostering schools, surrounding them with an atmosphere of civilization, … instead of allowing them to grow up as barbarians and savages."  [Id. at 16 (citing Brackeen v. Haaland, 994 F.3d 249, 282–83 (5th Cir. 2021))].  The administrator in charge of the Carlisle School in 1882, Captain R. H. Pratt, is today infamous for his support of the goal of "'kill[ing] the Indian' to 'save the man.'"  [Id. at 17 n.127 (quoting United States v. Erickson, 436 F. Supp. 3d 1242, 1267 (D.S.D. 2020))].

The Carlisle School was funded through Congressional appropriations of federal funds. [Id. (citing Act of May 17, 1882, 22 Stat. 68, ch. 163, p. 85)].  An 1882 funding bill specified that the purpose of the school's appropriation was "educational purposes for the Indian tribes." [Id.]  An 1892 bill authorized the Commissioner of Indian Affairs to make and enforce regulations to "secure the attendance of Indian children … at schools established and maintained for their benefit."  [Id. (citing Act of July 1, 1892, 27 Stat. 120)].  The Commissioner of Indian Affairs adopted admissions standards tailored to serve the purpose of the government's "civilization" policy by ensuring that the school indoctrinated children whom the government "perceived as being too 'Indian' or too connected to tribal culture."  [Id.].  These standards excluded from admission children with "one-eighth or less Indian blood," those whose parents did not live on a reservation, and those who were "presumed to have adopted the white man's manners and customs" or were otherwise "to all intents and purposes white people."  [Id. at 17–

18 (quoting Education Circular No. 85, Rules for the Collection of Pupils for Nonreservation
Schools)].

Mashpee children attended the Carlisle School between 1905 and 1918.  [Id. at 16].
Records show that the school documented each Mashpee student's compliance with the
regulations regarding admission, including specification of the students' tribe, "blood quantum,"
and verification of living in "Indian fashion."  [Id. at 18].  The Mashpee students were identified
as members of the Mashpee Nation, North Wampanoag Tribe, Pokanoket Tribe, or South Sea
Tribe.  [Id.]  Each of these tribal designations refers to a legal predecessor of the modern
Mashpee Wampanoag Tribe.  Each student that the Carlisle School identified as affiliated with
one of these four tribes had been certified by an official as "liv[ing] as an Indian."  [Id.]

The school maintained "extensive federal supervision over Mashpee students' education,
health[,] and finances."  [Id. at 16 (citing Erickson, 436 F. Supp. 3d at 1267)].  The
Superintendent and Commissioner of Indian Affairs oversaw the use and disbursement of funds
belonging to the students and also supervised health care for the students.  [Id. at 18].  In one
instance, the Superintendent authorized amputation of a Mashpee student's toe, without the
student's mother's knowledge of the procedure until after it was completed.  [Id.]  The school
also restricted Mashpee students' ability to leave its premises.  [Id. at 18–19].

From this evidence, the Secretary concluded that federal agents "exercised extraordinary
control over the Mashpee students attending Carlisle School from 1905 through 1918."  [Id. at
19].  In support of that decision, she cited the school's "integral part" in the government's
nationwide "federal Indian policy aimed at breaking up tribal communities," the government's
provision of health and social services to the Mashpee students, and the government's control
and management of the Mashpee students' funds.  [See id.]  Relying on the M-Opinion's

instruction to evaluate the government's "guardian-like action on behalf of the tribe," M-Opinion at 19, the Secretary concluded that the Carlisle School records constituted evidence of "a clear assertion of federal authority over the Tribe and its members and, therefore, evidence [of] the United States' assertion of jurisdiction over the Tribe in the decades leading up to passage of the IRA." [2021 ROD at 19].

Plaintiffs argue that the Secretary's analysis of the Carlisle School evidence "represents a complete and gross misstatement of the historical record." [Dkt. 45 at 16]. They cite evidence that the Mashpee students who attended Carlisle did so with their parents' voluntary consent, that state funds were available to cover the cost of Mashpee students' attendance at the school, and that a Carlisle School supervisor had discouraged Mashpee students from applying to the school because there were ample public school facilities for them in Massachusetts. [Id. at 16–17]. Relying on this record evidence, Plaintiffs charge the Secretary with crafting a "false narrative" that "smacks of intentional misrepresentation of the historical record." [Id. at 18].

The Court finds no substance beneath this puffery. Plaintiffs do not contest the legitimacy of any of the facts in the administrative record that form the basis for the Secretary's conclusion: that the Carlisle School was funded via Congressional appropriations for the purpose of educating Indian children [see 2021 ROD at 17]; that the school was part of the federal government's policy of forcibly eliminating tribal culture, including tribal languages and religions [id. at 16]; that Mashpee students attended the school [id. at 18]; that the Mashpee students were subject to the school's enrollment requirements, including a "blood quantum" and verification that they lived in "Indian fashion" [id.]; that federal officials at the school managed money on behalf of Mashpee students [id.]; and that federal officials at the school made health care decisions and expended federal health care funds on behalf of Mashpee students, [id.].

The facts recited herein, uncontested by Plaintiffs, are overwhelming evidence in support of the Secretary's conclusion that the federal government subjected the Mashpee to its jurisdiction prior to 1934.  The record in this case reveals the government's systemic, decades-long policy of forcibly dissolving Indigenous tribes and cultures by coercing children to assimilate into what the government defined as "white" society.  The Carlisle School, funded by Congress for the purpose of separating Indigenous children from their families and indoctrinating them in accordance with the government's policy, was an essential component of this system. By recognizing Mashpee students as sufficiently "Indian" to attend the Carlisle School, funding their education, making health care decisions on their behalf, and dictating their cultural practices and beliefs, the government took "guardian-like action[s]" over the Tribe.  See M-Opinion at 19.  The Secretary was thus reasonable in considering the government's inclusion of the Mashpee in federally funded ventures to "kill the Indian," [see 2021 ROD at 17 n.127 (quoting Erickson, 436 F. Supp. 3d at 1267)], as indicative of jurisdiction.  See Marasco & Nesselbush, 6 F.4th at 172 (requiring courts to uphold agency's decision if it is "supported by any rational view of the record").

Further, none of the facts Plaintiffs point to are inconsistent with the Secretary's conclusion that the Carlisle School evidence supports a finding that the Mashpee were under federal jurisdiction.  The Secretary does not assert, or rely upon an assertion, that Mashpee students attended the school involuntarily.  The availability of state funds for Mashpee children's attendance at the school, and the availability of public schooling in Massachusetts, do not disprove the record evidence demonstrating that federal funds were expended for the education, health care, and social support of Mashpee students as part of a nationwide federal program to detribalize children.

23

Moreover, the Court's task is not to determine which party's narrative description of the evidence in the administrative record is more compelling.  The Secretary's interpretation alone is under review, and the Court must merely determine whether she has provided "a satisfactory explanation" for that interpretation, "including a rational connection between the facts found and the choice made."  Minuteman Health, 291 F. Supp. 3d at 190.  And the Secretary's narrative need not be the only one plausibly supported by the record—it simply must be among those supported by "any rational view of the record."  See Marasco & Nesselbush, 6 F.4th at 172.  The Secretary here has provided a sufficiently rational connection between the facts in the Carlisle School record and her conclusion that this record is indicative of the federal government exercising jurisdiction over the Mashpee through its guardian-type actions toward Mashpee children.  This conclusion is a reasonable application of the M-Opinion's test to the record, and thus is not arbitrary or capricious.

## 2.  Historic Case Law

Plaintiffs cite various judicial decisions, spanning a period between the 1880s and 1970s, which suggest that federal courts did not regard the Mashpee as subject to federal jurisdiction. They argue that this case law is irreconcilable with the Secretary's conclusion that the Mashpee were under federal jurisdiction in 1934.

Specifically, Plaintiffs point to an 1884 Supreme Court decision which noted that "Indians in Massachusetts" were "remnants of tribes never recognized by treaties or legislative or executive acts of the United States as distinct political communities," Elk v. Wilkins, 112 U.S. 94, 108 (1884).  They also point to the common-law definition of a "tribe," first articulated by the Supreme Court in Montoya v. United States, 180 U.S. 261 (1901): "a body of Indians of the same or a similar race, united in a community under one leadership or government, and

24

inhabiting a particular though sometimes ill-defined territory." Id. at 266.  A series of decisions in the 1970s concluded that the Mashpee did not qualify as a "tribe" under the Montoya common-law definition.  See Mashpee Tribe v. Town of Mashpee, 447 F. Supp. 940 (D. Mass. 1978), aff'd sub nom. Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 582–85 (1st Cir. 1979).

This precedent does not foreclose the Secretary's decision to take the Designated Lands into trust for the Mashpee or render that decision arbitrary and capricious.  First, Justice Breyer's concurrence in Carcieri and the M-Opinion each recognize that the government's disclaimer of jurisdiction over a tribe is not dispositive of the question of whether the Tribe was in fact under federal jurisdiction in 1934.  See Carcieri, 555 U.S. at 397 (Breyer, J., concurring) ("[A] tribe may have been 'under Federal jurisdiction' in 1934 even though the Federal Government did not believe so at the time."); M-Opinion at 19 ("[A] tribe may have been under federal jurisdiction in 1934 even though the United States did not believe so at the time.").  Indeed, Justice Breyer recognized that, on at least three occasions, the government concluded after 1934 that it had erroneously excluded a tribe from its list of those under federal jurisdiction and thus subject to the IRA.  Carcieri, 555 U.S. at 398 (Breyer, J., concurring).  The government excluded the Stillaguamish Tribe from recognition despite the fact that this tribe had maintained treaty rights against the United States since 1855.  Id.  It had mistakenly concluded that the Grand Traverse Band of Ottawa and Chippewa Indians—which has continually existed since 1675—had dissolved.  Id.  And it had likewise mistakenly concluded that the Mole Lake Tribe no longer existed.  Id. at 399.  The government later remedied these errors by retroactively concluding that these tribes had each been under federal jurisdiction in 1934.  Id. at 398–99.

Thus, the Supreme Court's statement in Elk that Massachusetts tribes were not recognized by the federal government—which was published 50 years before the IRA's enactment in 1934—is hardly inconsistent with the Secretary's decision.  Likewise, the First Circuit's holding that the Mashpee did not meet Montoya's common-law definition of a "tribe" is not relevant.  The M-Opinion, not Montoya, provides the test that the Secretary was required to apply to this record.  Further, the Department formally recognized the Mashpee as a tribe in 2007, and that decision is not under review here.  The question at bar is whether the Mashpee were under federal jurisdiction in 1934, and Montoya does not provide a test for this.

### 3.  Probative Value of Reports and Census Records

Plaintiffs also assert that various reports and census records that the Secretary relied upon are of no probative value, and thus provided legally insufficient support for the Secretary's decision.  They specifically challenge five documentary records the Secretary evaluated: the Morse Report, the McKenney Report, the Schoolcraft Report, Indian Census records, and Carlisle School census records.  The Court examines the Secretary's consideration of each of these records in turn.

The Morse Report was an 1820 effort by the federal government to catalogue the Indigenous tribes of the United States.  The report was funded by the federal government, and the Secretary recognizes it as one of the government's "first initiatives to 'civilize' Indians." [2021 ROD at 13].  The report's author, the Rev. Jedidiah Morse, traveled as far west as present-day Wisconsin in an effort to provide the government with "as full and correct a view of the numbers and actual situation of the *whole* Indian population *within their jurisdiction*."  [Id. (first emphasis in original, second emphasis added)].  Morse included the Mashpee in the report, identifying 320 tribal members as living on the tribe's lands in the town of Mashpee.  [Id.]  He

recommended against forcibly removing the Tribe to western lands, citing their strong "local attachments" and their "public utility" as "expert whalemen and manufacturers."  [Id.]  The federal government later relied upon the Morse Report in setting its policy toward forcible Indian removal, and the Secretary credits the Report's description of the Mashpee with influencing the government's decision to protect the Tribe from removal.  [Id. at 14].  Accordingly, the Secretary construes the Morse Report as evidence that the government actively considered the Mashpee as under its jurisdiction in the 1820's, and thus subject to its removal policies.  [Id. at 15].

Five years after the Morse Report, Thomas McKenney, who served as Superintendent of Indian Affairs, submitted his own report on the status of various tribes.  [Id. at 14].  The McKenney Report listed the Mashpee as residing on their reservation in the town of Mashpee.  [Id.]  The Secretary likewise credits the McKenney Report with influencing the government's Indian removal policy, including its decision not to forcibly remove the Mashpee from their lands, and thus construes it as evidence that the Mashpee were sufficiently under federal jurisdiction to be subject to the federal removal policy.  [Id. at 15].

In 1847, Congress ordered an additional report on the country's tribes, to be prepared by Henry Schoolcraft, an agent in the Office of Indian Affairs.  [Id. at 20].  Schoolcraft summarized Mashpee history and made policy recommendations as to the Tribe; specifically, he proposed merging all Indian communities in Massachusetts except those at Mashpee, Herring Pond, and Martha's Vineyard into a single community under the supervision of an Indian commissioner.  [Id. at 20–21].  The Secretary construes the Schoolcraft Report to demonstrate federal recognition of the Mashpee as an extant tribe subject to federal jurisdiction, with the report actively considering whether the federal government ought to merge the Tribe with others according to a central plan.  [Id.]

The Secretary likewise relied on federal census records compiled between 1860 and 1930.  In some years during this period, the government had recorded its count of the Indigenous population according to a separate "Indian population schedule"; one such Indian schedule, in 1910, identified 157 "Mashpee Indians" living in the town of Mashpee.  [Id. at 23].  Further, incomplete census records from the Carlisle School from 1911 and 1912 list a count of Mashpee students.  [Id. at 24].  The Secretary construes these school census records as prepared in response to an 1884 law for the purpose of informing Congress' expenditure of federally appropriated funds to "educate, clothe, and provide services to Mashpee students attending the Carlisle School."  [Id.]  Further, the Secretary construes the totality of these Census records as "efforts to enumerate the Tribe and its members" that are "probative of and demonstrate the Tribe's relationship with the Federal Government."  [Id. at 25].

Plaintiffs propose alternate constructions of each of these records and argue that none are indicative of federal jurisdiction over the Mashpee.[7]  Again, however, the Court's task is not to review the Secretary's conclusion de novo, nor is it to consider her weighing of the evidence against alternate proposals.  It is simply to ask whether her conclusion was supported by "any rational view of the record."  Marasco & Nesselbush, 6 F.4th at 172.  Accordingly, Plaintiff's alternate interpretations of the record do not suffice to render the Secretary's interpretation arbitrary and capricious.  To the contrary, each of the sources the Plaintiffs dispute here is a documentation of an interaction between the Tribe and a federally funded venture prior to 1934.  The census records suggest that the federal government expended money on efforts to document

---

[7] Plaintiffs also suggest that the Secretary was arbitrary and capricious in interpreting these records differently from how the Department interpreted them in prior draft and published decisions concerning the Mashpee.  To the extent the Secretary interpreted records differently in the 2021 ROD than in the 2018 ROD, this was appropriate, as the D.C. district court held that the 2018 ROD was arbitrary and capricious, and remanded this matter for the Secretary to re-weigh the evidence in accordance with the M-Opinion.  Bernhardt, 466 F. Supp. 3d at 236.  To the extent the 2021 ROD conflicts with any unpublished draft decision, the Secretary owes the Court no explanation, as a draft opinion carries no legal force, is not subject to judicial review, and—nearly by definition—invites revision.

membership of the Tribe—a federal action that at least one court has previously held can be probative of jurisdiction.  See No Casino in Plymouth v. Jewell, 136 F. Supp. 3d 1166, 1184 (E.D. Cal. 2015) (holding that the federal government's efforts to document the Ione Band were evidence the tribe was under federal jurisdiction in 1934).  The Morse, McKinney, and Schoolcraft reports each suggest that the federal government may have considered the Mashpee as a candidate for forcible removal or reorganization.  Even if Plaintiffs are correct to suggest that none of these sources, taken alone, would establish grounds to conclude that the Mashpee were under federal jurisdiction in 1934, the M-Opinion prescribes a holistic process that requires the Secretary to review each of these forms of documentary evidence.  The Secretary was not arbitrary or capricious in reading these sources, in conjunction with other evidence (including the Carlisle School evidence), to collectively establish that the Mashpee were under federal jurisdiction at the time the IRA was enacted.

### 4.   Reservation Boundaries

Plaintiffs' final argument is that the Secretary violated the law by establishing two noncontiguous parcels of land—the Mashpee and Taunton sites—as the Tribe's initial reservation.  Plaintiffs cite no authority to support their assertion that an initial reservation may not be comprised of noncontiguous parcels.

The Secretary is authorized by statute to "proclaim new Indian reservations on lands acquired pursuant to any authority conferred" by law.  25 U.S.C. § 5110.  Regulations define the term "initial reservation"—the concept at issue here—as land "located within the State or States where the Indian tribe is now located" and "within an area where the tribe has significant historical connections and one or more of the following modern connections to the land: (1) The land is near where a significant number of tribal members reside; or (2) The land is within a 25–

mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at

that location for at least 2 years at the time of the application for land-into-trust; or (3) The tribe

can demonstrate other factors that establish the tribe's current connection to the land."  25 C.F.R.

§ 292.6(d).

Plaintiffs thus attempt to add to the regulations a requirement of contiguity that does not

exist.[8]  Under the regulations that do exist, the Secretary's decision to proclaim a reservation

consisting of both the Taunton and Mashpee parcels is not arbitrary or capricious.  The parcels

are both located in Massachusetts, the state where the Tribe is headquartered.  Likewise, the

parcels are both within an area—southeastern Massachusetts—where the Tribe has "significant

historical connections"; as detailed above, the Mashpee's traditional territory consists of all of

southeastern Massachusetts and eastern Rhode Island.  The Tribe has maintained a continuous

presence in the town of Mashpee since prior to European settlement and had established the

village of Cohannet on the site of present-day Taunton before selling that land to English

colonists in 1639.  [2021 ROD at 49].  And the Tribe has a modern connection to both parcels, as

about 40 percent of its members live in the town of Mashpee, and over 60 percent of its members

live within 50 miles of the Taunton parcel.  [Id. at 52].  The Secretary was thus reasonable in

determining that "a significant number" of tribal members live sufficiently "near" both parcels to

establish a modern connection to each.  [Id. at 53].

## IV.  CONCLUSION

The historical record indicates that the Mashpee have had a robust connection to the

Designated Lands for over four centuries.  Upon review of the 2021 ROD, the Court concludes

that the Secretary was not arbitrary and capricious in determining that the Tribe was under

---

[8] The Mashpee reservation is not the first noncontiguous initial reservation proclaimed under these provisions; the ROD discusses the Nottawaseppi Tribe's noncontiguous reservation.  [2021 ROD at 38 n.263].

federal jurisdiction in 1934 within the meaning of the IRA, nor was she arbitrary and capricious in proclaiming the Designated Lands as the Tribe's initial reservation.

Accordingly, Defendants' motions for summary judgment [Dkts. 46, 48] will be **GRANTED** and Plaintiffs' motion [Dkt. 45] will be **DENIED**.  Judgment for Defendants will enter accordingly.

**SO ORDERED.**

February 10, 2023                                        /s/ Angel Kelley
                                                        Hon. Angel Kelley
                                                        United States District Judge

31